Case number 18-1166, Missouri River Energy Services Petitioners v. Federal Energy Regulatory Commission. Mr. Acker for the petitioner, Mr. Fischer for the respondent, and Mr. Booth for the respondent intervenors. Good morning. May it please the Court, I'm Lawrence Acker. I'm accompanied by my colleague, Philip DeMone. While there are disputed legal issues in this case, as hard as it may be to believe, the facts are relatively straightforward. And if you'll bear with me a moment, I can explain them in relatively simple form. I think that's the funniest thing I've heard on this panel.  And that's why I thought I'd take a moment at the outset to try and clear some of the underbrush away. But if you have access to the Joint Exhibit page 363, it's a map that depicts the facilities that are involved in this controversy. Missouri River and Lincoln Electric have access to generation in the Missouri Basin Power Project, which is located on the green segment of the map. For more than 30 years, Missouri River received transmission service on facilities that are shown east of there, in the red segment of the map, under a 1977 contract now known as Agreement 496. From there, to the delivery point at Grand Island, the red facilities that are owned by Nebraska Public Power connect to facilities owned by the Western Area Power Administration that proceed north through the states of, through the upper Great Plains, through North Dakota, South Dakota, Minnesota, and Iowa, to deliver power to, among other things, the 33 communities that are served by Missouri River. In 2014, the Western Area told Missouri River that it would terminate transmission service under its own tariff when it became a member of the Southwest Power Pool. And in 2015, the Federal Energy Regulatory Commission allowed the Western Area to join the Southwest Power Pool, which then placed the delivery point, the point of interconnection between Missouri River and the Western Area Administration, in the Southwest Power Pool footprint. The core dispute in this case pertains to whether Missouri River should end up paying on the transmission service that it receives on the red portion of the line, between the green area and the blue area, congestion charges as well as marginal loss charges. Article 10 of Agreement 496 had provisions for losses and it provided for congestion management in Articles 7 and Article 12. Those can be seen in the Joint Appendix at pages 308 and 314. Much of FERC's decision, its brief, its conclusions, was whether Missouri River was able to evaluate its costs before joining the pool. We use that term also in our briefs. FERC uses it in its decision, it's prominent in the FERC's briefs, and it appears on the Power Pool's website to encompass both ownership of becoming a transmission owner as well as becoming a transmission customer. As it happens, being a transmission owner has no particular bearing on being a transmission customer. As the pool and Nebraska Power pointed out in its brief, notwithstanding some criticism that I leveled at them about that. All that said, the legal questions then flow from that situation because when Missouri River became a transmission customer being served by the Power Pool, it was now being charged marginal losses and congestion charges. Our belief, Missouri River's belief, is that they should have been exempt because they were covered by the same contract that covered Lincoln Electric's service. Lincoln Electric has generation in the same green area and used the same Nebraska Power Pool transmission facilities proceeding from the generation area up to the Western Area Power Administration and then continuing past that. They had become members of the pool some time ago. So the Commission says that there's a meaningful distinction between you and Lincoln Electric because Lincoln Electric was part of the pool before the charges came into effect, whereas you weren't. Correct. What's wrong with that? It's wrong because what they said is that Lincoln Electric faced no government compulsion. They faced government compulsion when they were already a member, now the tariff changed and they were stuck with these costs. So the Commission exempted them. We were outside the pool and the Commission approved the expansion of the Power Pool so that it encompassed the communities that we serve and particularly the interconnection between Nebraska Power's facilities and the Western Area Power Pool. We also had no choice but to take transmission service. You had a legal choice. We did not. It might have been practically economically disadvantageous not to sign up, but you had at least a legal choice whether to sign up. It's at best a theoretical legal choice. We would have had to replicate some 9,500 miles of Western Area Power Administration's transmission facilities in order to remain independent of the Power Pool. In fact, the parties stipulated in their joint stipulation facts that Missouri River had no choice. They were required to take the service that appears in stipulation number 31. So while in theory we could have turned it down, in real life we could not. Counsel, what is our scope of review on this case? It's whether FERC's orders withstand evaluation under the Arbitrary Capricious Standard and whether they're supported by substantial limits. Was your argument an evidentiary argument or is it a policy argument? No, it's an Arbitrary Capricious Argument. The facts are not in dispute. All the facts appear in stipulation. It's just that, as you observe, they're a little bit complicated and I needed to simplify them. I didn't understand, but what is it that you, Arbitrary Capricious simply means unreasonable. What is it that you think is unreasonable on the part of FERC? On the part of FERC? Yes. In particular, there are two things, there were two choices that the Commission had to make. Whether to conduct a Mobile Sierra evaluation. They said they didn't even touch it in their orders below. On the brief, they say, and the pool says, well, they didn't have to because you're a non-jurisdictional customer. Of course, that's not the Mobile Sierra standard. And the FERC says that we're now taking new services. But we're taking the same services that we previously took under the agreement 496. And there were provisions in that agreement that provided for how costs would be recovered and charges would be managed and congestion would be managed. And FERC never conducted the Mobile Sierra analysis that this court approved in Wisconsin power. The other thing, I mean, they just never did it. The other thing is when they concluded that the tariff was ambiguous. We don't think it's ambiguous, but grant them that it's ambiguous. Now they did not use contra pro forentum as an interpretive method. They used extrinsic evidence as an interpretive method. They're both perfectly fine methods. I'm not quibbling about whether there's value in either of them. But when the Commission chooses between two methods that they've used before, they need to explain how they made that selection. And they did. They just said, we really like extrinsic evidence. That's the one we're going to use. And that's the defense that was mounted in the Commission's brief to this court as well. There's no explanation of the choice. So that's why we think those are the two most salient aspects of the arbitrary capricious standard. And then, you know, there are others where they concluded that we are not similar to Lincoln Electric because of the timing of the decision to enter the pool and the fact that we did not face government compulsion. Our view is that we faced every bit as much government compulsion as Lincoln Electric did. Lincoln Electric was already there when the tariff changed. We weren't interested in joining the pool. The pool, in essence, joined us. Could you have become a customer and not a member? I'm sorry? Could you have become a customer and not a member? We could have. We made a choice to become a member. And then you wouldn't have had to pay the charges. No, that's not correct. We would have been subject to the charges because they are charges on transmission service, not on membership. So membership is not a relevant factor. The commission also said that we misplaced our reliance on statements that the pool made early on in 2012, 2013. Our view is that whatever reliance we placed on it, the facts had changed by the time the commission got to make the decision that affected us. And the commission knew that we were put into the pool. They had a stipulation that said we were required to take service, that it was necessary for us to take service from the pool. So I don't understand the commission's logic, but that's their logic. If the court doesn't have any other questions, that's about what I intended to say, and I'll reserve the rest of my time. Thank you for your consideration. All right. We'll hear from the commission's logic now. Good morning, Your Honors. And may it please the court, Jared Fish for the commission. I will be dividing my time with intervener and respondent. I disagree with opposing counsel that the facts are relatively straightforward. I think the facts are a bit complicated, but the legal issues are indeed relatively straightforward. Here, the commission reasonably drew a line between existing members of the Southwest Power Pool at the time congestion and marginal loss charges were assessed, members of the pool, and prospective non-members like Missouri River that joined the Power Pool after those charges were assessed. That distinction is rooted in several factors. First, it is rooted in the commission's own precedent in the dairy land orders. It is rooted in the express terms of the 2013 carve-out settlement and implementing tariff revisions related to this proceeding that expressly reject carve-out treatment for Missouri River. It is rooted in equitable considerations that Missouri River pay its fair share of costs of administering the Southwest Power Pool transmission service. And it is also consistent with the commission's longstanding policy of reducing carve-outs over time in favor of uniform grid administration under regional transmission organizations like the Southwest Power Pool. I'd like to pick up on... Incidentally, how much money is at stake? I'm not sure, Your Honor. I'm not sure how much money is at stake. We are talking about congestion and marginal loss charges on this... Yes, I know, but I was just wondering how much was involved. I'm not sure, Your Honor. I don't know. Judge Strunivasan, I'd like to pick up on your question getting at whether there was a choice or not for Missouri River to pay these charges and take Southwest Power Pool transmission service. The commission made very clear in the rehearing order, paragraphs 48 through 50, that the operative legal distinction is not about whether there is some choice in vacuo. It matters who is doing... who is compelling the entity to pay those charges. And in Dairyland, the commission stated that it is... the distinction is based on the fact that original transmission owners that joined a newly formed regional transmission organization were subject to new market rules that were effectively foisted upon them by the regional transmission organization. And that separated those entities from prospective non-members of that organization that joined later. It matters who is forcing them to make that choice, the regional transmission organization or other entities. Here, and the commission makes this clear in rehearing order paragraph 50, any compulsion on Missouri River to take transmission service was by its business partners to the 1977 contract. Heartland, Basin Electric, Western Upper Great Plains region. It had nothing to do with the Southwest Power Pool. And think of it another way. There's a difference, a reasonable distinction, between a regional transmission organization telling its members, we're now going to implement tariff changes that are going to force you to pay charges that you did not contemplate when you joined the organization, and an outside party coming in after those tariff changes are in effect saying, we're going to join you, but we're going to have a veto over the rules that you apply to us. That's effectively what Missouri River is attempting to do here. And that also makes equitable sense. If this court were to mandate that the commission reverse its policy, Missouri River would be the only entity of its kind that joined the Southwest Power Pool after these charges took effect under the integrated marketplace that would receive this exemption. And there are costs to that decision. That would mean that other entities in the pool that similarly benefit from Southwest Pool Transmission Service would have to absorb those additional costs of operating the system. And that is a distinction that this court has recognized in its 2007 decision, East Kentucky Power, and also its 2004 decision in Midwest ISO. And there the court recognized that when a party, even a party to a grandfathered agreement, that continues to pay a rate under that grandfathered agreement, benefits from a new service that includes benefits beyond the limited mandate of those grandfathered agreements, then there is no entitlement to a carve-out. The benefit is from having an expanded network, as Missouri River now enjoys. It is now part of a much larger transmission organization than it was prior to integration in 2015. And this court, just two years ago, in its decision in State Corporation of Kansas, recognized those benefits. Increased reliability, enhanced efficiency, and cost savings of $334 million over 10 years for all those members of the pool who take transmission service, as Missouri River does. That finding maps directly onto the findings in East Kentucky Power, where the court found, and I quote, benefits of enhanced reliability, increased efficiency, and more effective management of grid congestion. And it was those benefits that the court found dispositive to determining that the cost that those parties to grandfathered agreements were being charged were for a new service, and therefore there was no entitlement to a carve-out. Not only was there no entitlement to a carve-out, but there was no mobile Sierra problem. Now, first of all, to take a step back, really what this, moving to whether the commission modified or abrogated the 1977 contract, mobile Sierra, the mobile Sierra standard only comes into play when we're talking about public utilities and jurisdictional contracts. Now, in our brief, we basically assume, for purposes of argument, that perhaps mobile Sierra would apply if there was abrogation or modification. But in reality, as Missouri River correctly contends, this is a non-jurisdictional contract between non-public utilities. So really the only question is, was there any modification? Because the commission itself has said that we don't modify, we don't think we can modify, because we don't have jurisdiction, non-jurisdictional contracts. And there was no modification here. First of all, Missouri River has waived this argument because they do not articulate in their opening brief which part of the 1977 contract has actually been abrogated or modified. Second, East Kentucky River, there's no contract. That decision found there was no contract abrogation where the payments were attributed to a new service that could not be provided under the limited mandate of the grandfather agreement. So there's simply no... And furthermore, Missouri River mentions, actually relies on this court's decision in Wisconsin Public Power, where the court affirmed the commission's decision to carve out certain grandfather agreements in the Midwest Operator Regional Transmission Organization. But there, that was a distinct situation where there was a direct clash between the scheduling terms under the grandfather agreements and the scheduling terms under the revised tariff provisions in the Midwest Operator. There was no way to accommodate both. One had to give. And therefore, the court found that because of this clash, this collision between the two provisions, a carve-out was necessary. There is no clash here. In fact, Missouri River itself acknowledges that it is continuing to perform under the 1977 contract. It continues to pay the costs of infrastructure for infrastructure upgrades. Let me ask you to go back to the discrimination argument for a moment. I understand what you were saying, the difference between an RTO forcing someone and business partners making a decision. Their argument is effectively they had no choice. Is that correct or not correct? Economically, effectively, not a question of compulsion. Once Western Upper Great, this is in the stipulated facts. Once Western Upper Great Plains region terminated integrated system service, then, yes, Missouri River needed to take service from the Southwest Power Pool because it was now integrated into the pool and everyone was taking Southwest Power Pool service. But the key here is that we're talking about apples and oranges a bit. The 1977 contract is a contract for infrastructure upgrades. The rate that's paid on an annual basis is for maintenance and operating expenses. That was not a transmission service contract. Transmission service was provided to Missouri River by the integrated system. And that service was never grandfathered in under the Southwest Pool tariff. So, effectively, Missouri River is attempting to bootstrap a contract that is unrelated to transmission service as a way to get an exemption from congestion and marginal loss charges. Was that not done for Lincoln? Well, Lincoln was... The same contract, wasn't it? It was the same contract, Your Honor. But that was a negotiated settlement that was ultimately uncontested. And Missouri River could have contested that settlement. They were part of that proceeding, but they didn't. They had intervened and they didn't protest the settlement. So we don't actually know what went on behind closed doors to determine that Lincoln Electric would get an exemption. But the point at the end of the day is, is there a reasonable distinction that the commission made between Lincoln Electric and Missouri River? And its distinction between existing members... So you don't agree with the argument made by the intervener in pages 7 to 8 of its brief that they weren't compelled to join? Well, so there's a distinction between being compelled to join an organization and being compelled to take transmission service as a transmission customer. Because I asked that question and they said that there was no difference. Is that correct or not correct? Well, their reply... There is a difference. Are customers subject to the same charges? Yes, they are, Your Honor. So there isn't any difference. There's no difference. Well, there's a difference because they actually receive additional benefits from membership. They receive hedges against their congestion and marginal loss charges that allow them to defray those costs. So there's a reason why I can speculate on why they would want to be members. But at the end of the day, the choice issue doesn't come down to whether they had a choice to become a member or not or a choice to become a transmission customer or not. It is a question of whether they were an existing member being compelled by the organization they were part of to accept new tariff changes that they did not bargain for when they joined or took transmission service. You're talking about Lincoln. Correct. Okay. We'll hear from the intervener. Thank you, Your Honor. Good morning, Your Honor. This is William Booth from Michael Best on behalf of the pool. I won't belabor the application. Can you address yourself to the question I was asking? Which does not seem to be the basis for FERC's decision on non-discrimination. One more time, Your Honor. Which does not seem to be the base. You have an argument at 7 to 8 that Missouri River wasn't compelled to join? Correct, Your Honor. It wasn't compelled by the Southwest Power Pool. It might have not. I took the argument to be, and maybe I misread it, that they had choices. They didn't have to include memberships. They could have just been a customer, but I take it that that's not likely to make a difference, or is it? I think it is, Your Honor, the advantage to becoming a transmission owner. And just to be clear, when a transmission owner joins a pool and it's putting its transmission facilities under the pool's control, if that transmission owner serves the load, that transmission also is a transmission customer, which is why throughout all of the briefs, including opposing counsel's brief, the focus is on transmission owners and transmission customers. So I'm not quite sure why we're making the distinction here, now, during oral argument. There are many benefits to pooling service. I'm not making the distinction. It's only because I thought you made the distinction. I didn't understand that point at all. Opposing counsel is distinguishing transmission ownership and transmission customership. Right. And although I got the impression that the membership would give you certain benefits that would offset your cost as a customer. Transmission ownership gives you benefits. For example, Missouri River is able to recover its transmission revenue costs from other customers in Southwest Power Pool. Missouri River is able to rely on generators that it doesn't own or have under contract. If its generator goes out of service, there's a multitude of other generators available. What about the question I asked counsel, how much money does it take? I don't have the exact number because it depends on the number of transactions, but I can tell you it's greatly reduced because by being a grandfathered customer, by being a grandfathered customer, they will get transmission congestion rights, which is money given back to Missouri River to offset those costs. Presumably they wouldn't be here if it netted out to zero. It varies year to year, Your Honor. I think some regulated entities would rather be shielded completely from certain costs rather than run the risk that their congestion hedge might be too little. But I can tell you from my experience in RTOs, there are many circumstances in which a load serving entity's congestion revenue actually results in a net surplus of revenue. Are there further questions for the judge? Okay, thank you. Is there time left for petitioner? Thank you. Thank you. If I may, let me start off by answering Judge Silverman's question. It costs Missouri River roughly $5 million a year to be stuck with these charges. There is a difference, I hope I didn't leave a misimpression, there is a difference between being a transmission service customer and being a transmission owner. The charges that are in dispute are only assessed on the transmission service contract. To give you some perspective, whether the contract is with a member or a customer? The transmission service contract is only with a customer. The separate contract of being a joint owner of the pool, dedicating your facility, allowing the pool to manage your facilities, is what accompanies being a member of the pool. The terms are kind of conjoined by the parties as well as on SPP's website, where the term join the pool covers just about everything. Is a member the same thing as owner then? Being a member means that you've given control over the operation of your facilities to the pool. It's not a change in ownership. The pool is a management organization as it were. To put it in perspective, the 272 megawatt reservation that's an issue in this case, and it's the only issue in this case, represents roughly 0.5% of the peak load of the power pool's system. That's not a direct comparison because that's not how you do the calculation, but it's the one that's prominent in the record. When the integrated system joined the pool, it was represented to the commission that that represented a $344 million savings to the existing pool members, not to mention any benefits, if there were any, to people who were drafted into the pool. The statement that this was a decision of our business partners isn't a complete and accurate representation. First of all, they weren't business partners. They were transmission service providers, and the decision was made by the power pool and the FERC to allow this integration, and to say that the FERC had no role in this is to ignore the FERC's role in the regulation of regional transmission organizations. It's simply not correct. Unless you have any additional questions, I'm almost out of time. Do we have further questions? I guess we don't. Thank you very much for your consideration. You're welcome, and we'll take the matter under submission. We'll take a brief break while the panels change. Good.
judges: Garland, Srinivasan, Silberman